UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JEFERSON V. G., | : |
| Petitioner, | : Civ. No. 20-3644 (KM) |
| v. | : |
| THOMAS DECKER, *et al.*, | : **OPINION** |
| Respondents. | : |

**KEVIN MCNULTY, U.S.D.J.**

## I. INTRODUCTION

Petitioner, Jeferson V. G.,[1] is an immigration detainee currently held at the Hudson County Correctional Center, in Kearny, New Jersey. He is proceeding by way of counsel with an amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. (DE 22-1.) Presently before the Court is Petitioner's Motion for an Order to Show Cause, Preliminary Injunction, and Temporary Restraining Order. (DE 30). Pursuant to Local Civil Rule 78.1, this matter is decided without oral argument.

For the reasons set forth below, the Motion for an Order to Show Cause, Preliminary Injunction, and Temporary Restraining Order (DE 30) will be granted insofar as a Temporary Restraining Order shall be issued. This decision should not be taken as signifying a result in any other individual case; rather, the court has given particular consideration to the petitioner's asthma; the fact that he is detained in connection with deportation; the nonviolent underlying conduct; and his apparent history of compliance with relatively lenient conditions of release.

---

[1] Consistent with guidance regarding privacy concerns in social security and immigration cases by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Petitioner is identified herein only by his first name and last initial.

## II.     BACKGROUND

### A. COVID-19

The United States is currently in the midst of a global pandemic due to the rapid spread of an infectious disease known as COVID-19. When the World Health Organization first classified COVID-19 as a global pandemic on March 11, 2020, there were around 1,215 reported cases in the United States. *See* Ctrs. for Disease Control and Prevention, *Cases in U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Apr. 14, 2020). As of the date of this opinion, there are approximately 579,000 reported cases in the United States. *See id.* Currently, New York and New Jersey are two of the states most impacted by the virus, with 195,081 and 64,584 cases respectively. *See id.* As of April 6, 2020, the Hudson County Correctional Center ("HCCC") where Petitioner is detained, had identified that at least two immigration detainees tested positive for COVD-19, 58 HCCC staff members tested positive, 24 county and federal inmates tested positive, and one member of the correctional staff and two nurses who work at HCCC had died from complications due to COVID-19. (DE 32 at 21.)

According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 is a respiratory illness that can spread "[b]etween people who are in close contact with one another (within about 6 feet)" and from contact with contaminated surfaces. *See* Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 14, 2020). The CDC states that "[t]he virus that causes COVID-19 is spreading very easily and sustainably between people." *See id.* Even those who do not show symptoms of the virus may be able to spread it. *See id.* Common symptoms of COVID-19 include a fever, cough, and shortness of breath. *See* Ctrs. for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-

testing/symptoms.html (last visited Apr. 14, 2020). Certain groups of individuals, such as those who are over sixty-five (65) years of age, have asthma, or are immunocompromised, are at "high-risk for severe illness" from COVID-19. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 14, 2020). In order to prevent the spread of the virus, the CDC recommends "social distancing" (staying at least six feet away from others), wearing cloth face coverings when out in public, regular disinfection of "frequently touched surfaces," and washing hands often with soap and water, among other practices. *See* Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/disinfecting-your-home.html (last visited Apr. 14, 2020). Ultimately, however, "[t]he best way to prevent illness is to avoid being exposed to this virus." *See id.*

According to the CDC, correctional and detention facilities present "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments[.]" *See* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Apr. 14, 2020). This close proximity heightens the potential that COVID-19 will spread. *See id.* Moreover, the "ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent handwashing) may be limited and is determined by the supplies provided in the facility and by security considerations." *See id.* The stark reality is that "avoiding exposure to COVID-19 is impossible for most detainees and inmates." *Cristian A.R. v. Thomas Decker, et al.,* Civ. No. 20-3600, at *3 (D.N.J. Apr. 12, 2020). It is against this backdrop that Petitioner filed the instant action.

**B. Factual and Procedural Background of Petitioner's Case**

    *i.    Procedural History*

Petitioner is a 19-year-old native and citizen of El Salvador. (DE 5-12 at 1.) He arrived in the United States in July 2015, fleeing gang violence in his home country. (DE 22-1 at 3; DE 5-6 at 3.) On October 7, 2015, the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE") served Petitioner with a Notice to Appear, charging him with inadmissibility pursuant to section 212(a)(6)(A)(i) of the Immigration and Nationality Act and placing him into removal proceedings. (DE 5-6 at 3-4.) After determining that Petitioner was not dangerous, or a flight risk, he was released into the custody of his mother who has lived in the United States since 2005. (DE 22-1 at 17.)

On or about December 19, 2018, Petitioner submitted applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). (*Id.*) On June 5, 2019, an Immigration Judge ("IJ") denied Petitioner's applications and ordered him removed. (*Id.* at 15-16.) On appeal, the Board of Immigration Appeals ("BIA") determined that the IJ had failed to conduct the proper CAT analysis and remanded the matter for further proceedings. (DE 5-13.) On March 20, 2020, the IJ issued an opinion finding that Petitioner was, in fact, entitled to relief under CAT. (DE 5-1.) ICE has appealed the ruling and Petitioner remains detained pursuant to 8 U.S.C. § 1226(a). (DE 32-1 at 61-65.)

On March 31, 2020, Petitioner filed, through counsel, a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 in the Southern District of New York. (DE 1.) He separately filed a Motion for an Order to Show Cause, Preliminary Injunction, and Temporary Restraining Order ("TRO"). (DE 30.) On April 3, 2020, the case was transferred to the District of New Jersey and assigned to this Court. (DE 12.) He argues that his due process rights under the Fifth Amendment

have been violated by his conditions of confinement and he seeks immediate release. Respondents oppose the petition and motion.

### ii. Criminal History

Petitioner has previously been convicted of several nonviolent crimes. In September 2016 and again in October 2016, Petitioner was arrested and charged with criminal trespass. (DE 5-8 at 12 at 13-15.) He was adjudicated as a youthful offender and sentenced to thirty-days incarceration and one-year of probation. (*Id.*) Petitioner was again charged with criminal trespass in November 2016 and sentenced to a conditional discharge. (DE 5-12 at 6.)

In April 2017, Petitioner was arrested for "false personation." (DE 5-8 at 12.) He was adjudicated as a youthful offender and sentenced to thirty-days incarceration and one-year of probation. (*Id.*) In April 2018, Petitioner was arrested and ultimately convicted for unlawful possession of marijuana. (DE 5-8 at 11; DE 5-12 at 6.)[2] In August 2018, Petitioner was arrested and charged with "false personation" and drinking alcohol in a public place. (DE 5-12 at 6.) He was subsequently convicted of Disorderly Conduct. (*Id.*)

Additionally, Respondents state that Petitioner was suspended from school for "threatening a student and flashing gang signs" in October 2016. (DE 32 at 12-13.) The only evidence provided for this allegation, however, are the references contained within Petitioner's various immigration proceedings. (*Id.*)

### iii. Pre-Existing Medical Condition

---

[2] On March 15, 2019, Petitioner was granted leave to appeal his unlawful possession of marijuana conviction. (DE 5-11.) It appears that this appeal may still be pending.

Also relevant to the instant action is Petitioner's underlying medical condition. Petitioner states that he has suffered from asthma since he was 8 months old. (DE 5-14 at 3.) His mother submits that Petitioner has previously been hospitalized for his condition and that he requires medication to treat it. (*Id.*) She also states that although Petitioner was provided with an inhaler at HCCC, he has not been allowed to "keep it with him." (*Id.*)[3]

## C. HCCC's COVID-19 Protocols

In their brief, Respondents set forth the various measures HCCC has implemented to prevent the spread of COVID-19 at its facility. (DE 32 at 16-19.) Respondents state that as a result of COVID-19, additional medical staff are now on-site 24/7 to provide full healthcare for all inmate and detainee medical needs. (*Id.* at 16.) Additionally, HCCC has undertaken numerous measures to prevent the spread of the virus which include, but are not limited to: testing which follows the guidance of the CDC, medical evaluation for inmates and detainees who complain of illness, surgical masks for inmates or detainees who exhibit signs or symptoms of COVID-19, isolated cells for individuals who test positive for COVID-19 but do not require hospitalization, quarantine of individuals who are symptomatic while awaiting test results, and cohorting[4] of inmates and detainees who have had known exposure to a person with confirmed COVID-19. (*Id.* at 16-17.) Respondents state that within the designated "quarantine unit," each cell in the unit is spaced so

---

[3] Respondents do not appear to refute Petitioner's claim that he suffers from asthma. (*See generally* DE 32.) They do argue, however, that Petitioner has not provided any information regarding "the frequency or extent regarding his asthma symptoms, whether he has sought or received any medical care for his asthma, or how the facility has responded to any requests for additional or alternate care." (*Id.* at 33.)

[4] The CDC defines cohorting as "the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group." *See* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Apr. 14, 2020).

that inmates and detainees are at least six feet apart. (*Id.* at 17.) Respondents submit that since this unit is "operating well under capacity, there is ample space for the detainees to practice social distancing." (*Id.*) HCCC has also stopped accepting of ICE detainees who have been to China, Italy, or Iran in the past thirty-one (31) days, as well as detainees who were recently arrested but have not been tested for COVID-19 and medically cleared. (*Id.*)

Other precautionary measures HCCC has undertaken include an increase in the general cleaning of the facility to ensure it is repeatedly sanitized throughout the day, initiation of health screenings for employees and visitors, and web-based video and non-contact visitation for attorney visits. (*Id.* at 18.)

### III. LEGAL STANDARDS

#### A. Temporary Restraining Order

To obtain a temporary restraining order or a preliminary injunction, a petitioner must provide a "threshold" showing of two critical factors: (1) a likelihood of success on the merits of his claim; and (2) that he is "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). A likelihood of success on the merits requires "a showing significantly better than negligible but not necessarily more likely than not." *See id.* Additionally, "[h]ow strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* at 178 (quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)). If these two "gateway factors" are met, then the Court considers the remaining two factors which aim to balance the equities of the parties: "the possibility of harm to other interested persons from the grant or denial of the injunction," and "the public interest." *Id.* at 176 (quoting *Del. River*

*Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). The Court considers, "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

### B. "Extraordinary Circumstances" Test for Bail

In the Third Circuit's decision in *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986), the Court held that a petitioner may be eligible for bail prior to ruling on the merits of his petition under "extraordinary circumstances." *See id.* at 367. The Court held that this standard reflected "the recognition that a preliminary grant of bail is an exceptional form of relief in a habeas corpus proceeding." *See id.* The Court cited as an example of extraordinary circumstances its prior decision in *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955), where a petitioner who was "gravely ill" and required hospitalization was granted bail pending his habeas petition. *See id.* The Third Circuit in *Lucas* expressly clarified that a petitioner's poor health was not the only "extraordinary circumstance" that would justify a grant of bail. The Third Circuit reaffirmed this "extraordinary circumstance" test in its later opinions in *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) and *In re Souels*, 688 F. App'x 134, 135-36 (3d Cir. 2017). Moreover, recent decisions within this district have also utilized this standard in addressing whether "extraordinary circumstances" exist to grant bail to immigration habeas petitioners seeking relief during the COVID-19 pandemic. *See Cristian A.R. v. Thomas Decker, et al.,* Civ. No. 20-3600, at *16; *Rafael L.O.*, Civ. No. 20-3481, 2020 WL 1808843, at *5 (D.N.J. Apr. 9, 2020).

### IV. DISCUSSION

Petitioner argues that his due process rights under the Fifth Amendment have been violated by his conditions of confinement and he seeks immediate release. Under the circumstances

presented here, I find that he has met the standard for a TRO, as well as the extraordinary circumstances justifying bail.

### A. Temporary Restraining Order

*i. Likelihood of Success of the Merits*

Respondents argue that Petitioner cannot establish a likelihood of success on the merits of his claim. At the outset, Respondents allege that Petitioner is lawfully detained pursuant to 8 U.S.C. § 1226(a), and that the power to grant or deny bond lies solely within the discretion of immigration officials. (DE 32 at 26.) Respondents assert that district courts lack jurisdiction to review the decision of an immigration judge to deny bond. (*Id.*) However, as Petitioner emphasizes, he is not asserting a right to be released on bond pursuant to 8 U.S.C. § 1226(a). Rather, he is arguing that his substantive due rights have been violated because he is being subjected to conditions of confinement which amount to punishment under the Due Process Clause. (DE 35 at 6-7.) I find that this type of constitutional claim falls under the purview of the federal courts.

The Supreme Court has "left open the question whether [detainees] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017); *see also Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."). Federal

courts, however, have seemingly condoned challenges to conditions of confinement raised through a habeas petition. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242-44 (3d Cir. 2005); *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978). Furthermore, under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that this custody violates the constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). Accordingly, I find that Petitioner may raise his Fifth Amendment conditions of confinement claim through a § 2241 habeas petition.

Respondents next argue that Petitioner's claim is without merit because the conditions at HCCC do not amount to punishment and the officials do not have an "express intent" to punish him, especially in light of the measures the facility has undertaken to prevent the spread of COVID-19. (DE 32 at 28.) In turn, Petitioner asserts that the measures taken by HCCC do not sufficiently minimize the risk to his health and safety, and that he need not demonstrate that Respondents had the express intent to punish him, only that the conditions of his confinement amount to punishment. (DE 35 at 9-13.)

Unlike convicted prisoners whose conditions of confinement claims arise under the Eighth Amendment, pretrial and immigration detainees are entitled to heightened protections. *See Bell v. Wolfish*, 441 U.S. at 535-36; *see also E.D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (holding that "immigration detainees are entitled to the same due process protections" as pretrial detainees). Accordingly, an immigration detainee's conditions of confinement claim is properly analyzed under the Due Process Clause of the Fifth (or Fourteenth) Amendment. *See Sharkey*, 928 F.3d at 307. Under that clause, "a detainee may not be punished prior to an adjudication of guilt." *See id.*

10

In support of his claim, Petitioner relies on the Supreme Court's decision in *Helling v. McKinney*, 509 U.S. 25 (1993).[5] In *Helling*, the Court found that a prisoner successfully asserted a conditions of confinement claim based upon exposure to environmental tobacco smoke, despite the fact that he was asymptomatic, because the Eighth Amendment protected against "sufficiently imminent dangers[.]" *See id.* at 34-35. The Court determined that the Eighth Amendment requires individuals be provided with basic human needs, which includes "reasonable safety," and that it would be "cruel and unusual punishment to hold convicted criminals in unsafe conditions." *See id.* at 33 (internal quotation marks and citation omitted). *Helling* recognized that inmates are entitled to relief where they prove risk of exposure to serious contagious illnesses:

> We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year. In *Hutto v. Finney,* 437 U.S. 678, 682, 98 S.Ct. 2565, 2569, 57 L.Ed.2d 522 (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed. We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery. Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms.

*Id.* at 33.

---

[5] Respondents argue that reliance on *Helling* is misplaced since *Helling* involved an Eighth Amendment conditions of confinement challenge. (DE 32 at 32.) Yet, since immigration detainees are entitled to more considerate treatment than convicted prisoners, Eighth Amendment protections act as a floor to what constitutes acceptable conditions of confinement. *See Fuentes v. Wagner*, 206 F.3d 335, 344 (3d Cir. 2000) ("Pretrial detainees are entitled to at least as much protection as convicted prisoners, so the protections of the Eighth Amendment would seem to establish a floor of sorts." (internal quotation marks and citation omitted)).

While *Helling* does support Petitioner's proposition that exposure to an infectious disease may constitute an unconstitutional condition of confinement, the case does not provide the appropriate legal standard. *See Cristian A.R.,* Civ. No. 20-3600, at *20. The legal standard for determining whether an immigration detainee, such as Petitioner, is subjected to a condition of confinement that amounts to punishment, is whether that condition is "reasonably related to a legitimate government objective." *Sharkey*, 928 F.3d at 307. If it is not, then a court may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees." *Id.* (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). Accordingly, a court is required to ascertain whether the condition of confinement serves a legitimate purpose and whether the condition is rationally related to that legitimate purpose. *See Hubbard*, 538 F.3d at 232. A petitioner can demonstrate that a condition amounts to punishment if there is "an expressed intent to punish on the part of detention facility officials," if there is no "alternative purpose to which [the condition of confinement] may rationally be connected is assignable for it," *or* if the condition is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).

This inquiry has recently been addressed within the context of the current COVID-19 pandemic. In *Thakker v. Doll*, Civ. No. 20-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020), the Court found that although the government had a legitimate objective in "preventing detained aliens from absconding and ensuring that they appear for removal proceedings," the "unsanitary conditions" and "high risk of COVID-19 transmission" were not rationally related to that objective. *See id.* at *8. The Court explained that "[s]ocial distancing and proper hygiene are the *only* effective means by which we can stop the spread of COVID-19" and that the petitioners had

12

shown that, "despite their best efforts, they cannot practice these effective preventative measures in the Facilities." *See id.* The Court found Respondent's legitimate governmental objective was weakened in particular by the other options ICE had to monitor detainees that did not require their confinement. *See id.*

Similarly, in *Rafael L.O.*, the Court concluded that Respondents had a legitimate governmental objective in preventing detainees from absconding, but that the conditions of the prison, the current global pandemic, and the medical vulnerabilities the petitioners suffered from, resulted in conditions of confinement that were tantamount to punishment. *See Rafael L.O.*, 2020 WL 1808843, at *7-8. The Court found that, "Respondents [did not] have an express intent to punish Petitioners," but that "such intent is not a necessary prerequisite." *See id.* at *7.

Most recently, in *Cristian A.R.*, which dealt with detainees who were also confined at HCCC, the Court held that the totality of the circumstances compelled a finding that the conditions of confinement amounted to punishment. *See Cristian A.R.*, Civ. No. 20-3600, at *21. Although the Court found that the protocols Respondents implemented to prevent the spread of COVID-19 were "laudable," the Court ultimately determined that these enhanced measures were insufficient. *See id.* at *22. In describing the inadequacies of the facilities enhanced measures, the Court stated, in pertinent part:

> Petitioners spend 23.5 hours a day in cramped cells that they have to share with another person and the remaining thirty minutes out of their cells in common areas. It is during those thirty minutes that the detainees are at high risk for COVID-19 exposure and transmission. That brief period is the only time they have each day to take showers, make telephone calls to family members and attorneys, visit the commissary, and use recreation areas. Coming into close contact with frequently used items and shared spaces is unavoidable. Respondents do not state the Facilities clean and sanitize the common areas and frequently-touched common items in-between each period during which new detainees and inmates leave their cells. Instead, they provide that cleaning occurs at least three or four

> times per day. *See* Ahrendt Decl. ¶ 9.K; Edwards Decl. ¶¶ 11, 12.E. Accordingly, even crediting the Facilities' increased efforts to clean and disinfect shared spaces, Respondents cannot dispute that many, if not all, detainees use the common areas and objects in-between cleanings and are being exposed to potentially contaminated surfaces. Detainees also report that corrections officers' and medical staff's use of gloves and masks is inconsistent and certainly not in line with the CDC's recommendations, further compounding their risk of exposure. *See* Arcia-Quijano Decl. ¶ 5; Gordillo Decl. ¶ 11; Durkin Decl. ¶ 9.
>
> To make matters worse, detainees who want to do their part in curtailing the spread of COVID-19 to themselves and others are not provided the resources to do so. Detainees are forced to share soap or have no soap at all, *see, e.g.*, Eisenzweig Decl. ¶ 8, and lack other basic hygiene items like hand sanitizer. Respondents do not indicate whether and how often soap or other hygiene products are provided to detainees. That means, when they return to their cells to begin their next 23.5-hour period of confinement, detainees are unable to perform the most effective measure of combatting the spread of the virus: washing and disinfecting their hands. Showering is not an option because their only access to showers is during their brief half-hour recreational period. Covering their faces with masks or hands with gloves is also not possible, unless they have already shown signs of COVID-19, but by that time, avoiding infection is likely too late. *See* Ahrendt Decl. ¶ 9.G.; Edwards ¶ 14.

*Id.* at *22-24.

I am persuaded by the decisions in *Thakker*, *Rafael L.O.*, and *Cristian A.R.*, and find that the circumstances present in the instant case are also tantamount to punishment. Although Respondents have delineated the numerous measures they have undertaken to prevent the spread of COVID-19 in HCCC, those measures are insufficient to protect Petitioner whose asthma puts him at higher risk of severe illness from COVID-19. Petitioner alleges similar, if not the same, conditions of confinement as the petitioners in *Cristian A.R.* (DE 35 at 10.) He states that he is kept in his cell for over 23 hours a day where he must share a bathroom and common surfaces with other detainees. (*Id.*) He states that he lacks access to sanitizing materials and is unable to practice social distancing. (*Id.*) When Petitioner is permitted to shower, he must do so with 64 other

14

detainees. (*Id.*) Additionally, Petitioner alleges that he is unable to keep his inhaler with him at all times. (*Id.* at 18.)

Although I do not find that Respondents have an express intent to punish Petitioner, I need not making such a finding to conclude that the conditions of confinement, under the circumstances, amount to punishment. *See Bell*, 441 U.S. at 538; *see also Rafael L.O.*, 2020 WL 1808843, at *7. While Respondents have a legitimate governmental objective in ensuring that a detainee does not abscond, the current pandemic and Petitioner's underlying medical condition weakens the argument that his continued detention is reasonably related to that objective. This is especially true given the existence of available alternatives to Petitioner's confinement. *See Thakker*, 2020 WL 1671563, at *8. Accordingly, I find that Petitioner has shown a likelihood of success on the merits and has, therefore, established the first factor necessary for a TRO.

   ii.   *Irreparable Harm*

The second threshold showing Petitioner must make in order to be granted a TRO is that he is "more likely than not" to suffer irreparable harm absent the relief requested. *See Reilly*, 858 F.3d at 179. Respondents argue that Petitioner's desired relief will not ameliorate or diminish any heightened risk of injury resulting from COVID-19, nor will his release prevent him from contracting COVID-19. (DE 32 at 38.)

Indeed, there is currently no guarantee against contracting COVID-19. However, as stated previously, correctional and detention facilities present "unique challenges for control of COVID-19 transmission[.]" *See* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Apr. 14, 2020). Within facilities such as HCCC, detainees "cannot practically adhere to social distancing guidelines or the adequate level

15

of personal hygiene," measures which have been "touted as the most effective means to thwart the spread of the virus." *See Cristian A.R.*, Civ. No. 20-3600, at *25-26 (quoting *Rafael L.O.*, 2020 WL 1808843, at *8). The number of cases in HCCC alone underscore this point. (DE 32 at 20-21.) Moreover, given Petitioner's underlying asthma, he is especially at risk of developing severe illness. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 14, 2020). Against this backdrop, it is apparent that Petitioner has demonstrated irreparable harm if his confinement at HCCC continues.

### *iii.     Balancing of the Equities*

I am also satisfied that the remaining two factors—the possibility of harm to other interested persons from the grant or denial of the injunction and the public interest—weigh in favor of the grant of a TRO. For the reasons explained above, the possibility of harm to Petitioner is high. Moreover, the public interest also supports Petitioner's release before he contracts COVID-19 in order to "preserve critical medical resources and prevent further stress on the states' and country's already overburdened healthcare systems." *See Cristian A.R.*, Civ. No. 20-3600, at *27.

I do find, however, that Respondents have a legitimate interest in ensuring Petitioner does abscond and that he does not commit any offenses while on release. Although Petitioner does have multiple convictions, none of those convictions are violent in nature. Petitioner also has significant ties to this country, including the fact that his mother has lived here since 2005. He has been previously authorized release into her custody, and he indicates that if he is granted release now, he would return to her home. (DE 30-2 at 4.) I also note that Petitioner is discretionally detained pursuant to 8 U.S.C. § 1226(a) and he was recently granted relief under CAT. Given these considerations, I believe that both Petitioner's interest in release from confinement and

Respondent's interests in ensuring Petitioner does not flee, as well as protecting the public, can be appropriate addressed by releasing Petitioner to the custody of his mother, subject to electronic monitoring. The specific conditions of his release are set forth in the Order accompanying this Opinion.

### B. Extraordinary Circumstances Warranting Bail

The United States is in the throes of a global pandemic. The Court in *Thakker* aptly described the circumstances in which we are currently living:

> In a matter of weeks, the novel coronavirus COVID-19 has rampaged across the globe, altering the landscape of everyday American life in ways previously unimaginable. Large portions of our economy have come to a standstill. Children have been forced to attend school remotely. Workers deemed 'non-essential' to our national infrastructure have been told to stay home. Indeed, we now live our lives by terms we had never heard of a month ago—we are "social distancing" and "flattening the curve" to combat a global pandemic that has, as of the date of this writing, infected 719,700 people worldwide and killed more than 33,673. Each day these statistics move exponentially higher.

*Thakker*, 2020 WL 1371563, at *2 (footnotes omitted).

Petitioner is currently detained in a facility which is "at the epicenter of the outbreak" in the United States. *See Cristian A.R.*, Civ. No. 20-3600, at *28. He alleges difficulties adhering to the CDC's social distancing and personal hygiene guidelines. Most significantly, Petitioner has an underlying medical condition which makes him particularly vulnerable to severe complications and serious illness if he contracts COVID-19. These facts constitute extraordinary circumstances and warrant release on bail, especially given the discretionary nature of Petitioner's detention under 8 U.S.C. § 1226(a) and his recent grant of relief under CAT.

### V. CONCLUSION

For the foregoing reasons, Petitioner's Motion for an Order to Show Cause, Preliminary Injunction, and Temporary Restraining Order (DE 30) will be granted insofar as a Temporary Restraining Order shall be issued. An appropriate Order accompanies this Opinion.

DATED: April 15, 2020

/s/ Kevin McNulty
_____
KEVIN MCNULTY
United States District Judge